UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MARIA BONOT,

        Plaintiff,

                                 CASE NO. 2:08-CV-10084

v.                              JUDGE JOHN FEIKENS

                               MAGISTRATE JUDGE PAUL J. KOMIVES

ERIC K. SINSEKI[1],

        Defendant.

_____/


**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**


*Table of Contents*

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.    *Summary Judgment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    C.    *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        1.    *Summary of persons* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        2.    *Prior to July 3, 2006* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        3.    *The events of July 3, 2006* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        4.    *After July 3, 2006* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        5.    *Mr. Gabo's suspension* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        6.    *Ms. Bonot's medical error* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        7.    *Subsequent encounters* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        8.    *The events of June 9, 2007* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        9.    *Ms. Bonot's EEO complaint* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    D.    *Title VII* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        1.    *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        2.    *Discussion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
             a.    *The VAMC responded appropriately to plaintiff's allegations* . . . . . . . . . . . 18
             b.    *Plaintiff's working environment was not objectively hostile* . . . . . . . . . . . . 23
             c.    *Whether plaintiff's working environment was subjectively hostile* . . . . . . . 25
    E.    *Intentional Infliction of Emotional Distress* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    F.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

_____

    [1]The recently confirmed Secretary of the Department of Veterans Affairs, Eric K. Sinseki, automatically replaces James G. Peake as the defendant in this action. *See* Fed.R.Civ.P. 25(d). No order is necessary to effect this change. *See id.*

I.    <u>RECOMMENDATION</u>:

The Court should GRANT defendant's motion for summary judgment with regard to plaintiff's Title VII claim. This Court should also DISMISS plaintiff's tort claim for lack of subject matter jurisdiction.

II.    <u>REPORT</u>:

A.    *Procedural History*

1.    On February 6, 2009, this motion was referred to me pursuant to 28 U.S.C. § 636(b)(1)(B). Doc. Ent. 15.

2.    Plaintiff Maria Bonot is a medical worker in the employ of the Department of Veterans Affairs. She alleges that the Department of Veterans Affairs responded inappropriately to her allegations that she suffered sexual harassment from a co-worker, Rodolfo Gabo, while both were working at the John D. Dingell Veterans Affairs Medical Center in Detroit, Michigan ("VAMC"). On January 7, 2008, plaintiff initiated this action by filing a complaint. *See* Doc. Ent. 1. She seeks relief under Title VII of the Civil Rights Act of 1963, as amended, 42 U.S.C. s 2000e *et seq* ("Title VII") and in tort for intentional infliction of emotional distress. *Id*.

3.    On January 26, 2009, defendant filed this motion for summary judgment with thirty one exhibits attached. Doc. Ent. 11 [herinafter "Def.'s Mot. Summ. J."]. The defendant argues that the facts as they emerged in discovery, taken in the light most favorable to plaintiff, show that the VAMC timely and appropriately responded to plaintiff's allegations and that a hostile work environment was not present. Defendant also argues that, as regards plaintiff's tort claims, plaintiff has not exhausted her administrative remedies as required by the Federal Tort Claims Act.

4.    On February 18, 2009, plaintiff filed her response with twenty two exhibits attached.

Doc. Ent. 17 [herinafter "Resp."]. Plaintiff argues that the facts, taken in the light most favorable to her, show that the VAMC management did not timely and appropriately respond to plaintiff's allegations and that a hostile work environment was present. Plaintiff concedes that, as regards her tort claim of intentional infliction of emotional distress, she has not exhausted her administrative remedies.

5.      On March 3, 2009, defendants filed their reply to plaintiff's response with ten exhibits attached. Doc. Ent. 19 [herinafter "Reply"]. Defendants argue that plaintiff has failed to show that VAMC authorities responded unreasonably to plaintiff's allegations; that plaintiff's new claims of harassment at the VAMC prior to July 3, 2006, are not exhausted; and that a single incident does not create an objectively hostile work environment.

B.      *Summary Judgment*

Federal Rule of Civil Procedure 56(c) provides that summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is genuinely disputed when the fact affects the outcome of the case under the substantive law and a reasonable jury could find the fact in favor of the non-movant. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The purpose of the summary judgment rule is to preempt the expense of a trial where no genuine issue of material fact exists to be tried. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Collette v. Stein-Mart, Inc*. 126 F. App'x 678, 681 (6th Cir. 2005). The party seeking summary judgment bears the burden of showing that the pleadings, depositions, interrogatory answers, admissions and affidavits establish the absence of genuine issues of material fact. *See Celotex*, 477 U.S. at 323.

Summary judgment is appropriate if Ms. Bonot has failed to establish the existence of a material fact regarding any element essential to her case, and on which she would have borne the burden of proof at trial. *See Whitley v. Spencer Cty. Police Det.*, 178 F.3d 1298, 1999 WL 196499, at *2 (6th Cir. Mar. 26, 1999) (citing *Celotex*, 477 U.S. at 322). Ms. Bonot is not entitled to rest on her pleadings, but is required to come forward with evidence that would allow a rational factfinder to find in her favor. *See Bridgeport Music*, 371 F.3d at 889. Because Ms. Bonot is opposing summary judgment, her factual allegations are to be believed and all justifiable inferences drawn in her favor. *See DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir.2004) (citation omitted). However, the ultimate burden of demonstrating an issue for trial always remains on Ms. Bonot. *See id.*; Fed. R. Civ. P. 56(e)(2) (Non-movant required to "set out specific facts showing a genuine issue for trial.").

## C.    *Background*

This section does not include factual findings; the facts are merely presented in the light most favorable to the plaintiff. *See* Fed. R. Civ. P. 56(c); *DiCarlo*, 358 F.3d at 415. The length of this section reflects the complexity of the case as well as the high level of factual detail in the submissions of the parties. Most of the significant facts in this case, particularly regarding the conduct of the VAMC authorities following plaintiff's allegations against Mr. Gabo, are not controverted. Where there is disagreement between the parties, the position of the defendant is indicated.

### 1.    *Summary of persons*

For ease of reference, this Report and Recommendation refers to the statements and actions of the following deponents, affiants, and other individuals.

*Maria Teresa Bonot*

Plaintiff Maria Teresa Bonot, also called "Tess" or "Tessie," is an experienced full-time medical technologist at the VA, where she has worked for more than ten years. Ms. Bonot, a 45-year-old U.S. citizen, received her education in the U.S. as well as in her native Philippines. Ms. Bonot alleges that a years-long history of sexual harassment by co-worker Rudy Gabo culminated in his unwelcome sexual conduct on July 3, 2006. Ms. Bonot indicates that after she reported the July 3 incident, the VAMC authorities disregarded her complaints, punished Gabo insufficiently, and permitted contact between Gabo and herself to continue. Ms. Bonot was deposed. See Def's Mot. Summ. J., Ex. 1 [herinafter "Bonot Dep."], same as Resp., Ex. 1, same as Reply, Ex. 2.

*Rodolfo Gabo*

Rodolfo Gabo, also called "Rudy," was a lead medical technologist at the VAMC until his retirement on March 29, 2008, following the initiation of this litigation. Mr. Gabo had no supervisory authority over Ms. Bonot. Mr. Gabo, 64 years old,  began working at the VAMC in 2001, and notwithstanding the complaint by Ms. Bonot has an unblemished record of professional medical work. Like Ms. Bonot, Mr. Gabo is a U.S. citizen born in the Philippines. Although Mr. Gabo has admitted to some of the conduct of which Ms. Bonot complains, he has consistently insisted that his behavior was not sexual and that he thought of Ms. Bonot as a sister.

Rodolfo Gabo was deposed as part of the VAMC's internal process. *See* Def's Mot. Summ. J., Ex. 27 [herinafter "Gabo EEO Dep."], same as Resp., Ex. 2, same as Reply., Ex. 2. He was  again deposed in the course of this litigation. *See* Def.'s Mot. Summ. J., Ex. 3 [herinafter "Gabo Dep."].

*Ursula Baker-Dunson*

Ursula Baker-Dunson is a psychological technician at the VAMC and works primarily for

the American Federation of Government Employees Local 933, of which she has been a member for 16 years. Ms. Baker-Dunson is the union representative for both Mr. Gabo and Ms. Bonot. Ms. Baker-Dunson was deposed. *See* Def's Mot. Summ. J., Ex. 24 [hereinafter "Baker-Dunson Dep."], same as Resp., Ex. 3.

*Dr. Richard Vander Heide*

Dr. Richard Vander Heide is the director of the Pathology and Laboratory Medicine Service ("PALMS") at the VAMC in Detroit. Dr. Vander Heide met with Ms. Bonot in person following the incident of July 3, 2006, and remained in correspondence with both Ms. Bonot and Mr. Gabo throughout the period described in the complaint. Dr. Vander Heide established the separation between Ms. Bonot and Mr. Gabo by internal memoranda, *see* Resp., Exs. 17-18, same as Reply, Exs. 9-10, and is generally responsible for the discipline of PALMS workers.

*Lisa Olney*

Lisa Olney is the administrative officer for Dr. Vander Heide. She oversees administrative operations within PALMS. After Ms. Olney returned from vacation on July 10, 2006, she met with Ms. Bonot and discussed her allegations. Ms. Olney visited the scene of the incident, investigated measures that would discourage further harassment, met with Ms. Bonot a number of times, and arranged for the schedules of Ms. Bonot and Mr. Gabo to be changed so that contact between the two would be minimized. Ms. Olney makes a declaration in support of defendant's motion for summary judgment. *See* Def.'s Mot. Summ. J., Ex. 2 [herinafter "Olney Decl."], same as Reply, Ex. 4.

*Paulina Javier*

Paulina Javier is a supervisory medical technologist at the VAMC and is Ms. Bonot's

supervisor. Ms. Javier was the first person Ms. Bonot informed of her allegations against Mr. Gabo, and Ms. Javier accompanied Ms. Bonot as she visited the police, EEO, and the office of Dr. Vander Heide. Ms. Javier makes a declaration in support of defendant's motion for summary judgment. *See* Def.'s Mot. Summ. J., Ex. 5 [herinafter "Javier Decl."], same as Reply, Ex. 3.

*Trudy Gargala*

Trudy Gargala is a supervisory medical technologist at the VAMC and was Mr. Gabo's supervisor. Following the July 3, 2006, incident of which Ms. Bonot complains, Ms. Gargala assisted in ensuring that Ms. Bonot and Mr. Gabo remained separated while at work. Ms. Gargala makes a declaration in support of defendant's motion for summary judgment. *See* Def.'s Mot. Summ. J., Ex. 19 [herinafter "Gargala Decl."], same as Reply, Ex. 7.

*Lydia Ward*

Lydia Ward was Ms. Bonot's EEO counselor following the July 3, 2006, incident. Ms. Ward works in the Office of Resolution Management in the VA.

*Kathleen Osinski*

Kathleen Osinski is the Chief of the Human Resources Service at the VAMC, and her responsibilities include ensuring awareness of the VAMC's policy against sexual harassment. Ms. Osinski makes a declaration in support of defendant's motion for summary judgment. *See* Def.'s Mot. Summ. J., Ex. 9 [herinafter "Osinksi Decl."].

*Katherine Davey*

Katherine Davey is employed as the Equal Employment Opportunity Program Assistant at the VAMC in Detroit. Ms. Davey makes a declaration in support of defendant's motion for summary judgment. *See* Def.'s Mot. Summ. J., Ex. 30 [herinafter "Davey Decl."].

2.    *Prior to July 3, 2006*

The VAMC has a policy against sexual harassment. *See* Osinski Decl., at 1-2; Def.'s Mot. Summ. J., Exs. 11 (VA policy against sexual harassment), 12 (VA informational pamphlet regarding sexual harrasment). Ms. Bonot and Mr. Gabo were both certified as having completed a two-hour course in sexual harassment prevention each year. *See* Def.'s Mot. Summ. J., Ex. 28; Bonot Dep., at 36.

Ms. Bonot and Mr. Gabo had a professional friendship over the course of the several years of their employment together. They may have had lunch together once. Their friendship was close enough that Ms. Bonot assisted Mr. Gabo in using VAMC equipment to test the glucose levels in his own blood, in apparent violation of VAMC policy. She assisted no other VAMC workers in this way. During the course of their friendship, Ms. Bonot alleges that Mr. Gabo occasionally made requests that the two meet outside of work. On one or more occasions, Mr. Gabo held Ms. Bonot's hand or wrist forcefully while he addressed his requests to her, and Ms. Bonot indicated that she was uncomfortable on these occasions. On another occasion, Mr. Gabo put his hands over Ms. Bonot's eyes while she was speaking on the phone. Mr. Gabo's invitations numbered around ten and took place over the course of two years, or less than one every two months. These requests are not alleged to have involved obscenity, overt sexual invitations or references, threats, or any physical contact besides the above. Ms. Bonot did not report these incidents to anyone until after July 3, 2006. *See id.* at 42-46, 86; Def.'s Mot. Summ. J., Ex. 14 (plaintiff reporting these incidents to the VAMC on September 6, 2006).

3.    *The events of July 3, 2006*

On July 3, 2006, Ms. Bonot was working in her laboratory's small dark room, where she had

8

a significant workload. During the afternoon, Mr. Gabo entered the dark room and drew up a chair, making casual conversation about Ms. Bonot's holiday plans, family, and other subjects. Ms. Bonot was not interested in the conversation but responded to Mr. Gabo's questions without taking her eyes off her work. After a period of time, Mr. Gabo stood up as if to exit from the room, but instead of withdrawing, placed both hands on Ms. Bonot's shoulders and began to massage them. Mr. Gabo was standing behind Ms. Bonot, laughing and continuing the conversation; Ms. Bonot, sitting, froze and her shoulders became tense and uncomfortable. Mr. Gabo then rested one hand on Ms. Bonot's shoulder, and Ms. Bonot indicates that at this point she heard Mr. Gabo's heavy breathing. Mr. Gabo denies this orientation of his hands and the heavy breathing. Mr. Gabo agrees that before he finally withdrew from the room, he kissed Ms. Bonot lightly on the cheek. Ms. Bonot responded by shouting Mr. Gabo's name. Upon leaving, Mr. Gabo requested a hug indicating that it was his birthday, but it was not his birthday and Ms. Bonot refused. Some time later, Mr. Gabo entered the dark room again, requesting that Ms. Bonot draw his blood and again requesting a hug; Ms. Bonot denied both requests. Mr. Gabo denies that he made the second appearance or requested a hug. After Mr. Gabo departed, Ms. Bonot smelled bodily fluids that she later identified as semen, and concluded that Mr. Gabo must have masturbated while in the room with her. Mr. Gabo emphatically denies that he masturbated. *See* Bonot Dep. at 97-102; Gabo EEO Dep. at 6-8.

4.     *After July 3, 2006*

On July 5, 2006, VAMC employees returned to work from the Independence Day holiday. That morning, Ms. Bonot related the incident of July 3, 2006, to her supervisor Paulina Javier in the elevator. In relating the incident, Ms. Bonot did not include her allegation that Mr. Gabo masturbated while in the room with her. Ms. Javier encouraged Ms. Bonot to report the incident. Ms.

Javier then went immediately to notify Dr. Vander Heide while Ms. Bonot made a written report, and then Ms. Javier brought Ms. Bonot personally to see Dr. Vander Heide. *See* Bonot Dep., at 47-49; Javier Decl., at 1-2.

After her meeting with Dr. Vander Heide, Mr. Gabo approached Ms. Bonot to apologize, but Ms. Bonot did not accept the apology and walked away from him. *See* Bonot Dep., at 51.

On July 5, Ms. Javier escorted Ms. Bonot to the police and established contact with the VAMC Office of Resolution Management ("ORM"). *Id.* at 51-52; *see also* Def.'s Mot. Summ. J., Ex. 4 (VA police offense report). The police indicated that the matter should be handled internally in the VA; Ms. Bonot subsequently  gave a statement to Lydia Brown of the ORM over the phone. In none of these statements or reports did Ms. Bonot indicate that Mr. Gabo had masturbated while in the room with her. *See* Bonot Dep., at 52, 58. On July 6, 2006, Ms. Javier began working in Ms. Bonot's lab for Ms. Bonot's comfort and protection. *See Id.* at 53.

On July 10, 2006, Lisa Olney returned from vacation and summoned Ms. Bonot into her office, indicating that she would handle the investigation. Over the course of two or three meetings, Ms. Olney informed Ms. Bonot of her rights and the possibility of relief through the EEO, ORM, police, and litigation. Ms. Olney completed a "report of contact" noting Ms. Bonot's description of the events of July 3, 2006, which did not include Ms. Bonot's later allegation that Mr. Gabo masturbated. Ms. Olney asked Ms. Bonot whether she wanted Mr. Gabo to be fired; Ms. Bonot replied, "Nobody wants to get fired . . . I just want to do the right thing." Ms. Bonot took Ms. Olney to the dark room where the July 3, 2006, encounter with Mr. Gabo took place and described the incident in detail. *Id.* at 59-60; Olney Decl., at 3; Def.'s Mot. Summ. J., Ex. 8 (Ms. Olney's report of contact).

5.     *Mr. Gabo's suspension*

After Ms. Bonot reported the incident of July 3 to the VAMC authorities, Mr. Gabo received a 3-day suspension. *See* Gabo Dep., at 29. The proposed suspension, which issued from the office of Dr. Vander Heide, cited the July 3, 2006, incident as well as Mr. Gabo's request that Ms. Bonot draw his blood in violation of VAMC policy. After reviewing Mr. Gabo's written response and weighing the severity of the allegations against Mr. Gabo's work record, Dr. Vander Heide permitted Mr. Gabo to accept, alternatively, a 3-day paper suspension.  *See* Def's Mot. Summ. J., Exs. 12 (Letter of July 7, 2006, on Proposed Discipline to Rudolfo Gabo, filed under seal), 13 (Letter of July 20, 2006, on Finalized Discipline to Rudolfo Gabo, filed under seal); *see also*, Osinski Decl., at 1 ("Paper" or administrative suspension carries same weight as ordinary suspension in the VA.). Ms. Bonot, despite her admission that she on one occasion drew Mr. Gabo's blood in violation of VAMC policy, was apparently not sanctioned.

6.     *Ms. Bonot's medical error*

On August 19, 2006, Ms. Bonot committed a medical error, the only one of her career. She mistakenly recorded that medical test results indicated that a patient's blood was A positive instead of B positive, which could have had fatal consequences for that patient had a fellow medical technologist not discovered the error. A disciplinary letter informing Ms. Bonot of her 10-day suspension noted that she would have discovered the error if she had observed the correct medical procedure and performed the tests accordingly. Ms. Bonot indicated to Dr. Vander Heide that the error was related to personal distress occasioned by Mr. Gabo's harassment. See. Resp., Exs. 11-12.

7.     *Subsequent encounters*

After Ms. Bonot's allegations of July 5, 2006, Ms. Bonot and Mr. Gabo would occasionally

see each other or pass by each other in workplace common areas. Ms. Bonot insisted that arrangements be made that no visual contact ever take place between herself and Mr. Gabo, filing a number of reports of contact within the VAMC corresponding to these encounters. *See, e.g.,* Def.'s Mot. Summ. J., Ex. 16 (report of contact by Ms. Bonot describing visual contact with Mr. Gabo in the Microbiology Department); *see also, id.,* Ex. 17 (report of contact by Mr. Gabo describing the same incident).

Ms. Bonot relates that her co-workers responded negatively to her pursuit of a complaint against Mr. Gabo. *See* Bonot Dep., at 128-129. Two of Ms. Bonot's co-workers wrote letters to Dr. Vander Heide defending Mr. Gabo's character and reputation. *See* Resp., Exs. 4, 5.

On November 16, 2006, a letter from union representative Ursula Baker-Dunson to Paulina Javier requested that stricter arrangements be made to ensure the separation of Mr. Gabo and Ms. Bonot. *See* Doc. Ent. 17, Ex. 16. On November 21, 2006, memoranda issued from the office of Dr. Vander Heide to Mr. Gabo and Ms. Bonot effecting the separation by restrictions on the workplace hours and movement of both Mr. Gabo and Ms. Bonot. *See* Def.'s Mot. Summ. J., Exs. 18, 19 (memoranda from Dr. Vander Heide to Ms. Bonot and Mr. Gabo, respectively). The supervisors were ordered to help ensure their separation. *See, e.g.,* Gargala Decl., at 1-2.

8.     *The events of June 9, 2007*

On June 9, 2007, both Mr. Gabo and Ms. Bonot arrived to work a weekend shift, Ms. Bonot having arranged to switch weekends with a co-worker. Mr. Gabo, anxious to maintain their separation, spent the weekend in uncomfortable conditions behind locked doors and some of his work was delayed as a result. While Ms. Bonot had cleared the weekend switch with two supervisors, *see* Reply, Exs., 21, 22, the office of Dr. Vander Heide nonetheless admonished her for

12

violating the terms of the arrangement of November 21, 2006, and interfering with Mr. Gabo's work. A letter of proposed admonishment, sent June 18, 2007, sharply criticized Ms. Bonot for the apparent contradiction between her behavior of June 9, 2007, and her previous indications that she was "scared to work with or even be around" Mr. Gabo. *See* Resp., Ex. 20 (Letter from Dr. Vander Heide to Ms. Bono regarding proposed admonishment); *see also,* Reply, Exs. 9 (Mr. Gabo's report of contact describing events of June 9, 2007), 10 (Ms. Gargala's report of contact describing same events).

When Mr. Gabo later violated the same memoranda the following year by appearing in the cafeteria for lunch a half-hour early, he was admonished and charged with a half-hour of "AWOL" (absence without leave). *See* Def.'s Mot. Summ. J., Exs. 22, 23.

9.    *Ms. Bonot's EEO complaint*

On July 6, 2006, Ms. Bonot established contact with the EEO office within the VAMC and initiated and pursued a complaint against Mr. Gabo for sexual harassment. *See, e.g.,* Def.'s Mot. Summ. J., Exs. 7, 15, 31; Resp., Ex. 15. However, Ms. Bonot became discouraged when Lisa Olney told Ursula Baker-Dunson, within earshot of Ms. Bonot, that she thought Ms. Bonot was lying. Ms. Bonot later abandoned the EEO process and initiated this suit after counsel for the VAMC indicated "that [plaintiff] did not need counseling and that she needed to get over the incident with Gabo." *See* Resp., at 13.

D.    *Title VII*

1.    *Legal Standard*

A work environment may be so intimidating, hostile, or offensive as to constitute discrimination based on sex in violation of the Civil Rights Act. *See Meritor Sav. Bank v. Vinson*,

13

477 U.S. 57, 66-67 (1986). 42 U.S.C.A. §§ 2000e et seq. The relevant section of Title VII of the

Civil Rights Act of 1964, as amended in 1972, provides as follows:

> § 2000e-2. Discrimination because of race, color, religion, sex, or national origin
> (a) Employers.
> It shall be an unlawful employment practice for an employer—
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

*Id.* Guidelines promulgated by the Equal Employment Opportunities Commission make clear that

sexual harassment may constitute discrimination on the basis of sex proscribed by Title VII. 29 CFR

§ 1604.11(a)-(d).

> § 1604.11. Sexual harassment.
> (a) Harassment on the basis of sex is a violation of Sec. 703 of Title VII.
> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.
> . . .
> (d) With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.

*Id.* Because it is not controverted that Mr. Gabo did not have a supervisory relationship with Ms.

Bonot, this case is of the type described by 29 CFR § 1604.11(a)(3) and 29 CFR § 1604.11(d).

Title VII is not a code of workplace civility; it does not protect against all co-worker

harassment. *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 760; *see also id. at* 774

14

(Thomas, J., dissenting) ("Popular misconceptions notwithstanding, sexual harassment is not a freestanding federal tort, but a form of employment discrimination."). Title VII is violated if "discrimination based on sex has created a hostile or abusive work environment." *Burnett v. Tyco Corp.*, 203 F.3d 980, 982 (6th Cir.2000) (citing *Meritor Sav. Bank*, 477 U.S. at 66).

The Sixth Circuit has described the contours of a sex discrimination claim based on a hostile working environment as follows:

> "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank*, 477 U.S. at 65. Whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is "quintessentially a question of fact." *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006) (internal quotation marks omitted). To determine whether a work environment is "hostile" or "abusive," courts look at the totality of the circumstances. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); see also *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999) (stating that "it is well-established that the court must consider the totality of circumstances"). The factfinder must evaluate the conduct at issue by both an objective and subjective standard. *Harris*, 510 U.S. at 21-22.

*Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332-333 (6th Cir. 2008) (some citations omitted). An objectively hostile environment is one characterized by harassment "that a reasonable person would find hostile or abusive," while a subjectively hostile environment is one where the victim "perceives that the conditions of employment have been altered by the discriminatory conduct." *Harris*, 510 U.S. at 21-22. An "isolated incident" of sexual harassment does not in general result in a hostile work environment. *Sand v. George P. Johnson Co.*, 1982 WL 31007, at *13 (E.D. Mich. 1982) (Cohn, J.) Summary judgment is appropriate only if the evidence is so one-sided that there is no genuine issue of material fact as to whether there was a hostile work environment. *Abeita v. Transam. Mailings, Inc.*, 159 F.3d 246, 250 (6th Cir.1998).

It is not enough that a plaintiff show that a hostile work environment exists; in a case

15

involving co-worker harassment the plaintiff must establish that the employer is liable under a heightened standard. "The standard for determining an employer's liability in co-worker discrimination cases is markedly different from the standard applied in supervisor harassment cases." *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803 (6th Cir. 1994). To prevail on a claim based on coworker harassment, a plaintiff must establish that "(1) the sexual harassment was unwelcome, (2) the harassment was based on sex, (3) the harassing behavior was sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment, and (4) the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action." *Knox v. Neaton Auto Prods. Mfg.*, 375 F.3d 451, 459 (6th Cir.2004); *see also Hawkins,* 517 F.3d at 332.

Liability thus arises from the actions or omissions of the employer and not the behavior of the co-worker who is alleged to have engaged in the harassment. This follows simply from the nature of the claim: the employer's response to an allegation of sexual harassment must necessarily come after at least one incident of sexual harassment has already taken place. The Sixth Circuit has explained that the employer can be liable only if its response "manifests indifference or unreasonableness in light of the facts the employer knew or should have known because the discriminatory act is not direct harassment but an inappropriate response to a claim of harassment." *Blankenship v. Parke Care Centers*, 123 F.3d 868, 873 (6th Cir. 1997), overruled in part by *Ellerth*, 524 U.S. 742, and *Faragher*, 524 U.S. 775; *see also Hawkins*, 517 F.3d at 338 ("*Blankenship* remains good law for the proposition that a company may be held liable for coworker harassment if its 'response manifests indifference or unreasonableness in light of the facts the employer knew or should have known.'").

16

The employee who alleges that she is the victim of sexual harassment is not entitled to dictate the employer's response to her allegations. *See Blankenship*, 123 F.3d at 873-74. It is sometimes the case that the victim of sexual harassment by a co-worker is desirous of immediate termination of or total separation from the co-worker, but the employer is not required to grant the employee's request, so long as the employer takes reasonable and appropriate measures under the circumstances to remedy the problem. *See id*.

2.   *Discussion*

Considering the factors set out in *Knox*, it is clear that Plaintiff has successfully alleged that she was (1) the victim of unwelcome sexual harassment by a co-worker (2) based on her sex. However, in order to survive summary judgment, plaintiff must further show the existence of a genuine issue of material fact as to whether plaintiff was confronted with (3) harassment so "severe or pervasive" that it constituted (a) a subjectively hostile working environment, and (b) an objectively hostile working environment. *See Knox* 375 F.3d at 459. Additionally, there must be a genuine issue of material fact as to whether (4) the VAMC failed to implement prompt and appropriate corrective action following plaintiff's allegations. *See id*. If a genuine issue of material fact is absent regarding any of the last three issues - whether the working environment was objectively hostile, whether the working environment was subjectively hostile, or whether the VAMC failed to respond promptly and appropriately - summary judgment against plaintiff is warranted. In other words, defendant has three ways to prevail on this motion.

I conclude that defendant is entitled to summary judgment regarding plaintiff's Title VII claim because plaintiff has not demonstrated a genuine issue of material fact as to whether the VAMC failed to implement prompt and appropriate corrective action following plaintiff's

allegations. Even in the light most favorable to the plaintiff, the facts do not suggest that the VAMC response to plaintiff's allegations regarding Mr. Gabo manifested indifference or unreasonableness. This Court could, alternatively, grant defendant's motion for summary judgment on the grounds that the facts, even viewed in the light most favorable to the plaintiff, are insufficient to show that plaintiff's working environment was objectively hostile. Finally, I conclude that a genuine issue of material fact does exist as to whether it plaintiff's working environment was subjectively hostile.

      a.    *The VAMC responded appropriately to plaintiff's allegations.*

The response by the VAMC to plaintiff's allegations, about which there is significant agreement between the parties, did not manifest indifference or unreasonableness even when viewed in the light most favorable to plaintiff.

To prevail on a claim based on coworker harassment, plaintiff must establish that "the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action*." Knox*, 375 F.3d at 459 (6th Cir.2004). Because the parties agree that the VAMC was made aware of most of the allegations of harassment during the month of July, 2006, the inquiry focuses on the employer's "own acts or omissions" following the allegations. *Blankenship*, 123 F.3d at 873. The VAMC's response will be deemed adequate for the purposes of Title VII if it is "reasonably calculated to end the harassment." *Jackson v. Quanex Corp.*, 191 F.3d 647, 663-64 (6th Cir.1999).

Employers "that take affirmative steps reasonably calculated to prevent and put an end to a pattern of harassment - such as personally counseling harassers, sending them letters emphasizing the company's policies and the seriousness of the allegations against them, and threatening harassers with serious discipline if future allegations are substantiated - are more likely to be deemed to have

responded appropriately." *Hawkins,* 517 F.3d at 342-43 (explaining the Tenth Circuit's analysis in *Scarberry*); see also *Scarberry v. Exxonmobil Oil Corp.*, 328 F.3d 1255, 1259 (10th Cir. 2003). *Jackson*, 191 F.3d at 664; *Blankenship*, 123 F.3d at 870-71, 874 (An employer's response was sufficient when, after the first complaint, management not only separated the employees, but (1) formulated an "observation network" designed to monitor the harasser, (2) checked with the victim daily to ensure that she had not been further bothered by the harasser, and (3) after further complaints, met with the harasser the next day to give him written notice that this was his "one and only" warning, that further harassment would result in immediate termination, and that harassment "absolutely will not be tolerated").

The record before this Court, even viewed in the light most favorable to plaintiff, reflects that the VAMC took an extraordinary number of remedial and corrective steps over a span of months and years following plaintiff's allegations against Mr. Gabo. A significant number of plaintiff's superiors at the VAMC became promptly engaged in addressing plaintiff's complaints. The VAMC's corrective steps appear to have been a complete success: plaintiff was not subjected to any sexual harassment after July 5, 2006. The record indicates that the VAMC went above and beyond the minimum response courts have required under Title VII.

The most significant feature of the VAMC's response, for the purposes of this inquiry, is its sharp admonishment and discipline of Mr. Gabo for the behavior of which Ms. Bonot complained and for violating VAMC policy; the letter sent to Mr. Gabo indicated that his conduct would "not be tolerated." Def.'s Mot. Summ. J., Ex. 12 (filed under seal). The VAMC also conducted emergency sexual harassment prevention training among employees following the allegations. *See* Olney Decl., at 4; Def.'s Mot. Summ. J., Ex. 8. These actions sharply distinguish the VAMC's

response from cases where the employer took little or no action to discipline the alleged harasser or prevent future harassment.

Plaintiff herself deposes that her superiors within the VAMC made significant efforts to encourage and facilitate a resolution of her complaints. Plaintiff's supervisor Paulina Javier encouraged plaintiff to report the incident of July 3, 2006. Ms. Javier facilitated plaintiff's meetings with Dr. Vander Heide, with the VAMC police, and with the EEO personnel. Ms. Javier personally stayed close to plaintiff to ensure her safety, while the EEO office contacted plaintiff directly. *See* Javier Decl., at 1-2. Lisa Olney, the administrative officer for PALMS, met with plaintiff and reviewed plaintiff's options. Ms. Olney ultimately decided not to install an alarm on the door of the dark room where plaintiff had been working, but did arrange for a sign to be posted outside the room. *See* Olney Decl., at 16-17.

Mr. Gabo's encounters with Ms. Bonot over the months and years that followed her allegations against him, which the parties agree generally involved only fleeting visual contact, are trivial and cannot constitute sexual harassment within the meaning of Title VII. The record only reveals one instance of Mr. Gabo speaking to Ms. Bonot following the allegations, and this was Mr. Gabo's apology on the morning of July 5, 2006. Although Ms. Bonot was personally distressed by these encounters and was desirous of avoiding them, the VAMC was not required to heed her demands for an absolute separation between herself and Mr. Gabo. *See Blankenship*, 123 F.3d at 873-74. The encounters that followed Ms. Bonot's allegations are noteworthy only for their infrequency and benign nature, which in turn indicate the reasonableness of the VAMC's response. No incidents of alleged sexual harassment took place after the VAMC initiated its response on July 5, 2006.

Mr. Gabo's encounters with Ms. Bonot before her complaints on July 5, 2006, in which he is alleged to have held her hand or placed his hands over her eyes, taken in the light most favorable to Ms. Bonot, may have constituted torts. However, in this inquiry, the focus is not on Mr. Gabo's alleged conduct but on the conduct of the VA. Since Ms. Bonot did not bring these incidents, which occurred on average less than once every two months over a period of two years, to the attention of the VAMC until well after her complaint regarding the events of July 3, 2006, it would have been impossible for the VAMC to take measures to discourage Mr. Gabo. There has been no suggestion that during this period Mr. Gabo sexually harassed anyone other than Ms. Bonot, that anyone other than Mr. Gabo sexually harassed Ms. Bonot, or even that anyone other than Mr. Gabo sexually harassed anyone else at Ms. Bonot's workplace. It is impossible to conclude that the VAMC had any kind of constructive notice that the workplace was being rendered hostile by sexual harassment. Meanwhile, despite having no notice of sexual harassment during the period that the alleged harassment was taking place, the VAMC nonetheless required employees to receive two hours of sexual harassment prevention training, which both plaintiff and Mr. Gabo had completed. *See* Osinski Decl., at 1-2; Def.'s Mot. Summ. J., Exs. 11 (VA policy against sexual harassment), 12 (VA informational pamphlet regarding sexual harrasment); Def.'s Mot. Summ. J., Ex. 28; Bonot Dep., at 36.

Plaintiff complains that her allegations were not wholly believed by all of her superiors at the VA, including Lisa Olney (who allegedly told Ursula Baker-Dunson that plaintiff was lying) and VAMC counsel (who allegedly told plaintiff to "get over" the incident with Mr. Gabo). However, even if this is true, as defendant correctly points out, an agent of an employer confronting an allegation of sexual harassment involving two co-workers who relate two different versions of the

21

event must make a credibility determination in order to proceed. That credibility determination can only give rise to liability under Title VII if it is unreasonable or involves discrimination against one of the two co-workers on the basis of sex. In determining the punishment to be meted out to Mr. Gabo, the VAMC was not required by Title VII to accept Ms. Bonot's version of the July 3, 2006, event any more than it was required to accept Mr. Gabo's. If the VAMC had completely believed Ms. Bonot's R-rated version of the July 3, 2006, event - a version that changed significantly on July 24, 2006, to include the allegation that Mr. Gabo had masturbated while in the room with her - then perhaps indeed more than a three day paper suspension for Mr. Gabo would have been in order. *See* Resp., Ex. 15, at 3-4. Conversely, if Mr. Gabo's G-rated version had been wholly believed, perhaps he would have received no punishment at all. Even viewed in the light most favorable to the plaintiff, given the surrounding circumstances there is nothing in the record that suggests that the VAMC's determination to punish Mr. Gabo with a three-day paper suspension was unreasonable, indifferent, or based on sex. Instead, it is noteworthy that while plaintiff, like Mr. Gabo, had violated VAMC policy by testing Mr. Gabo's blood using VAMC equipment, plaintiff was not punished and Mr. Gabo was.

Plaintiff complains that the VAMC discriminated against her on the basis of sex when it admonished her for switching weekends in violation of November 21, 2006, memoranda establishing the separation of herself and Mr. Gabo. This admonishment, based on the information presently before this Court, appears to be the subject of ongoing arbitration within the VA. *See* Resp., at 24. For the purposes of this inquiry, it is only necessary to determine whether, in the light most favorable to plaintiff, the decision to punish plaintiff manifested indifference or unreasonableness with regard to plaintiff's allegations of sexual harassment. The issue thus properly framed makes

22

clear that this action does not. When Mr. Gabo later violated the same memoranda by appearing in the cafeteria for lunch a half-hour early, he was likewise admonished and charged with a half-hour of "AWOL" (absence without leave). *See* Def.'s Mot. Summ. J., Ex. 22, 23. The strict enforcement of the formalized separation of which plaintiff complains actually weighs in defendant's favor, as it shows the VAMC's sensitivity and attentiveness to the issue of sexual harassment.

Plaintiff devotes significant attention to the details of her encounters with Mr. Gabo, but her emphasis on Mr. Gabo's alleged conduct is misplaced. Her suit is not against Mr. Gabo but against the VA; Rodolfo Gabo is not a party to this case. Emphasis is more properly placed on the VAMC's response to her complaints. The issue being thus properly framed, it is clear that no genuine issue of material fact exists as to whether the VAMC responded reasonably and appropriately to plaintiff's allegations against Mr. Gabo.

      b.    *Plaintiff's working environment was not objectively hostile*.

This Court does not need to reach the issue of whether Plaintiff's working environment was objectively hostile in order to dispose of this motion. *See* discussion, *supra* Part D.2. The following analysis is provided because the issue was raised by the parties and because it represents an alternative basis for this Court to grant defendant's motion. A work environment must be objectively hostile in order for plaintiff to prevail on her claim under Title VII. *Harris*, 510 U.S. at 21-22. In this case, the evidence is so one-sided that there is no genuine issue of material fact as to whether there was an objectively hostile work environment.

An objectively hostile environment is one characterized by harassment "that a reasonable person would find hostile or abusive." *Id*. A workplace is hostile when it is permeated with "discriminatory intimidation, ridicule or insult" sufficiently severe or pervasive to alter the

23

conditions of employment. *Meritor Sav. Bank*, 477 U.S. at 65-67. A court may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Jordan*, 464 F.3d at 597 (quoting *Harris*, 510 U.S. at 23); see also *Hawkins*, 517 F.3d 333.

Plaintiff lists a number of particulars that she suggests, taken in the light most favorable to her, contributed to an objectively hostile work environment. *See* Resp., at 22-23. These particulars include stress resulting in plaintiff's medical error; Lisa Olney indicating to plaintiff's union representative that plaintiff was lying; the failure of the VAMC to heed plaintiff's requests to avoid all visual contact with Mr. Gabo; subsequent encounters with Mr. Gabo; plaintiff's co-workers siding with Mr. Gabo; and VAMC counsel indicating to plaintiff that she should "get over Gabo's actions" and that plaintiff did not need counseling. *Id.*

On the one hand, Mr. Gabo's actions on July 3, 2006, as plaintiff has alleged them, could certainly be described as humiliating and offensive. However, Mr. Gabo's actions constituted only an isolated event. Title VII imposes liability on an employer for a hostile "environment" created by co-workers and not a hostile act; an isolated act does not create an ongoing environment for which an employer is liable. *See Allen v. Michigan Dep't of Corr.*, 165 F.3d 405, 411 (6th Cir. 1999).

Mr. Gabo's unwelcome invitations to go out boating, which occurred less than once every two months over a span of two years, and which did not involve insult, obscenity, or direct sexual invitations, simply cannot be described as "discriminatory intimidation, ridicule or insult" so "severe and pervasive" that a reasonable person would find the work environment hostile or abusive. *See, e.g., Clark v. United Parcel Serv.*, 400 F.3d 341, 351 (6th Cir. 2005) (recitation of vulgar jokes,

24

placing a vibrating pager on a co-worker's thigh, and pulling at her clothes over a span of two years did not establish a prima facie showing of an objectively hostile work environment).

Plaintiff's medical error cannot for the purposes of this inquiry be attributed to Mr. Gabo's harassment, as it occurred fully one month after the harassment by all accounts had ceased. Meanwhile, plaintiff committed no medical errors during the period during which she alleges she was harassed. Finally, although a reasonable person in Ms. Bonot's shoes may have felt distressed and isolated by the lack of sympathy from co-workers or by the comments of Lisa Olney and VAMC counsel, the alleged statements of these individuals simply do not involve discrimination based on sex, i.e., the kind of "discriminatory intimidation, ridicule or insult" that contribute to an objectively hostile work environment.

While a reasonable person could certainly find Mr. Gabo's alleged conduct on July 3, 2006, shocking and humiliating, a reasonable juror could not find that a reasonable person would perceive that, as a result of this incident, Ms. Bonot's workplace was so permeated with "discriminatory intimidation, ridicule or insult" that was so "severe or pervasive" as to alter the conditions of her employment. Accordingly, plaintiff's working environment was not objectively hostile as a matter of law and defendant is entitled to summary judgment.

      c.    *Whether plaintiff's working environment was subjectively hostile*

This Court does not need to reach the issue of whether Plaintiff's working environment was subjectively hostile in order to dispose of this motion. *See* discussion, *supra* Part D.2. The following analysis is provided because the issue was raised by the parties. A work environment must be subjectively hostile in order for plaintiff to prevail on her claim under Title VII. *Harris*, 510 U.S. at 21-22. In this case, there is a genuine issue of material fact as to whether plaintiff subjectively

perceived a hostile work environment.

A workplace is subjectively hostile where the victim of discrimination "perceives that the conditions of employment have been altered by the discriminatory conduct." *Harris*, 510 U.S. at 21-22. Specifically, the discrimination must have "made it more difficult [for the plaintiff-worker] to do the job." *Williams v. General Motors Corp.*, 187 F.3d 553, 567 (6th Cir. 1999). In other words, a prima facie showing of a subjectively hostile working environment is established if Ms. Bonot subjectively perceived that discrimination based on sex made her work more difficult.

Plaintiff lists a number of particulars that she suggests, taken in the light most favorable to her, contributed to a subjectively hostile work environment. *See* Resp., at 23-25. These particulars include the July 3, 2006, harassment by Mr. Gabo; Lisa Olney rapidly spreading news that plaintiff was divorced in 2004; a long history of harassment by Mr. Gabo; the failure of the VAMC to heed her requests to avoid all contact with Mr. Gabo; insensitive and deficient responses by management to her requests; Lisa Olney indicating to plaintiff's union representative that plaintiff was lying; VAMC counsel indicating to plaintiff that she should "get over Gabo's actions" and that plaintiff did not need counseling; the VAMC disciplining plaintiff for violating the terms of the November 21, 2006, memoranda establishing the separation of Mr. Gabo and plaintiff; counseling plaintiff is currently receiving; and stress resulting in plaintiff's medical error. *See id.*

Many of these particulars, however distressing to plaintiff, do not even in the light most favorable to plaintiff involve discrimination against plaintiff on the basis of sex. By way of example, plaintiff complains that Lisa Olney (a woman) told Ursula Baker-Dunson (a woman) within plaintiff's hearing that she thought plaintiff was lying. While Lisa Olney's statement is one that is, in the light most favorable to plaintiff, harsh and untrue, it simply does not support a subjective

26

inference that a discriminatory environment was present. In this regard it is significant that many VAMC workers who are affiants and declarants in favor of defendant's motion, including Trudy Gargala, Lisa Olney, Ursula Baker-Dunson, and Paulina Javier, are themselves female.

At most the particulars cited by plaintiff relating to the VAMC's response, taken in the light most favorable to plaintiff, show that plaintiff was placed under significant emotional strain and that she felt isolated at work. The fact that plaintiff was able to return to work after the incident of July 3, 2006, and continue working among co-workers and supervisors who she felt did not sympathize with her testifies to a forbearing and selfless character, and should not weigh against her as defendant suggests. While the VAMC's response was not what plaintiff had in mind, an employer does not discriminate against plaintiff when it declines to pursue the course of action desired by the plaintiff, so long as the employer's response is reasonable. *See* discussion, *supra* Part D.2.a. While plaintiff may indeed have felt subjectively distressed and isolated by the alleged particulars of the VAMC's response she describes, much of the record is so one-sided as to make it doubtful that a reasonable factfinder would conclude that plaintiff subjectively perceived that those actions constituted discrimination based on sex that altered the conditions of Ms. Bonot's employment.

However, two of the particulars cited by plaintiff support an inference that plaintiff subjectively perceived that sexual harassment made her work more difficult: Mr. Gabo's alleged harassment prior to July 3, 2006 and then the incident of July 3, 2006, itself. These particulars, taken in the light most favorable to plaintiff, are sufficient to create a genuine issue of material fact as to whether plaintiff's working environment was subjectively perceived as hostile. Plaintiff has deposed that Mr. Gabo held her hand or wrist forcefully while he addressed invitations to her, and plaintiff indicated that she was uncomfortable on these occasions. *See* Bonot Dep., at 42-46. Plaintiff also

27

deposed that Mr. Gabo once put his hands over Ms. Bonot's eyes while she was speaking on the phone. *See id.* Finally, Plaintiff has deposed that on July 3, 2006, Mr. Gabo entered her dark room at work, touched her, kissed her without her consent, and masturbated. *See id.,* at 97-102.

Considering whether the working environment was objectively hostile, it was necessary to distinguish between a hostile co-worker's "act" that renders an afternoon, day, or week's work more difficult for a reasonable person and a hostile "environment" that makes a reasonable person's work itself more difficult, i.e., that alters the conditions of employment. *See* discussion, *supra* Part D.2.b. Here we are not concerned with a reasonable person's perception, but the subjective perception of the plaintiff herself. The plaintiff has stated that the above sexual harassment made her work more difficult. Defendants have provided evidence that the circumstances of plaintiff's divorce and her other personal history make it unlikely that plaintiff was in much subjective distress over Mr. Gabo's alleged harassment. In the final analysis, this Court should not conclude that as a matter of law plaintiff did not perceive that Mr. Gabo's alleged harassment made it more difficult for her to do her job. In other words, the facts taken in the light most favorable to plaintiff are sufficient to support the inference that Ms. Bonot perceived that Gabo's sexual harassment rendered her job more difficult.

In conclusion, there is much agreement between the parties on the factual details of the VAMC's response to plaintiff's allegations, and the facts are so one-sided as to preclude a jury's finding that the VAMC's response manifested indifference or unreasonableness for the purposes of Title VII in light of the facts the VAMC knew or should have known. Accordingly, I conclude that defendants have carried their burden and are entitled to summary judgment. In addition, I have considered whether plaintiff's working environment can be considered objectively or subjectively

hostile. I conclude that plaintiff's working environment was not objectively hostile as a matter of law, although a genuine issue of material fact exists as to whether it was subjectively hostile. Accordingly, should this Court disagree with my analysis of the reasonableness and appropriateness of the VAMC's response, this Court may alternatively grant defendant's motion on the grounds that plaintiff's working environment was not objectively hostile as a matter of law.

E.    *Intentional Infliction of Emotional Distress*

Plaintiff has advanced a tort claim of intentional infliction of emotional distress. The Federal Tort Claims Act ("FTCA"), 28 U.S.C. s 2765(a), requires a tort claimant to exhaust administrative remedies before instituting a suit against the United States. *See McNeil v. United States*, 508 U.S. 106, 107 (1993); *Lundstrum v. Lyng*, 954 F.2d 1142, 1145 (1991). Defendant argues that plaintiff has neither invoked nor exhausted any administrative remedies with regard to her tort claim. Defendant provides a declaration by the VAMC's regional counsel, Roland Bessette, that plaintiff has not raised her tort claim within the department. *See* Def's Mot. Summ. J., Ex 31. In her response to defendant's motion, plaintiff concedes that her tort claims are not exhausted under the FTCA. Accordingly, plaintiff's tort claim should be dismissed for lack of subject matter jurisdiction.

F.    *Conclusion*

In view of the foregoing, the Court should conclude that, with regard to plaintiff's Title VII claim, defendants have carried their burden under Rule 56(c) and defendant is entitled to summary judgment. Also, this Court should dismiss plaintiff's tort claim for lack of subject matter jurisdiction.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C.

§ 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 8/31/09

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record  by electronic means or U.S. Mail on August 31, 2009.

s/Eddrey Butts
Case Manager